Good morning all. We will be hearing three cases today and we will begin with Drummond v. Progressive Specialty Insurance Company number 24-1267 and we will begin with Mr. Cashton. Good morning and may it please the court my name is Jeff Cashton of King & Spaulding. I represent the progressive defendants petitioners. I'd like to reserve three minutes for rebuttal. In this breach of contract lawsuit plaintiffs allege that they were paid less than they were owed under their automobile insurance policies for their total loss vehicles. The policies at issue require progressive to pay insureds the actual cash value of their total loss vehicles. The district court abused its discretion in certifying the classes below. While we make several arguments in our briefs I intend to focus on two points in argument. First in evaluating predominance the district court abused its discretion by focusing on plaintiffs challenge to an isolated intermediate step in progressives process for estimating actual cash value. The proper focus for this breach of contract action is not on any alleged flaws in progressives methodology but whether at the end of the day insureds were paid actual cash value for their total loss vehicles as the contracts required. This is a predominance argument but there are two steps. One is is there a common question and does the common question predominate and your brief somewhat lumps those two together here. This adjustment biases in a downward direction. You have a cash value that's higher or something but if it biases downward isn't that a common question even if you're then going to say it doesn't predominate? Your honor we argue in our brief that we don't think it's a common question because it's not the type of common question that drives the resolution of the case. Okay so why wouldn't it drive the resolution of the case? Ultimately maybe that doesn't predominate but that's at least an important step. It's not like this is random. It is a downward adjustment that does get applied much like in Lewis where there was a downward condition adjustment but if you look at what we argue and the plaintiffs agree that the central dismerits dispute according to the plaintiffs page 22 of their brief is whether in the end actual cash value was paid and so you don't you don't resolve the breach of contract claim by simply looking at whether this intermediate step this projected sold adjustment was valid or not. You still have to determine in the end were insureds paid actual cash value. That's the common quest that's the question that needs to be common. It's not in this case that's normally to be predominantly common. That is the ultimate question but why can't the question along the way to the ultimate question still be a common question? The guidance from the Supreme Court in the Dukes case, the Walmart case, is that the common question has to be one that's driving the resolution. It's not enough just to simply identify something that's common in the case. It has to be something that's common that if answered would answer viability, standing, damages for everyone. You're reading drives a revolution pretty strongly. You know it doesn't say that it has to resolve the case. It has to drive that I understand that to be in the sense of help to resolve the case. Move this case significantly towards resolution. Why shouldn't we read Dukes that way? Well we we don't think that's the that's the best way to read the case because otherwise we do think you're going to end up with a situation where any common question that can be articulated by plaintiffs will be enough to satisfy that element of Rule 23. But then there's then there's the further it might be common but it might not predominate. Yes your honor and I understand those are different issues and we do think here that the common question has to be was were insureds paid actual cash value. That's the car that's the question that need would need to be common to justify class certification. But even even if the court were to accept what the district court did below and treat this question as common enough to satisfy Rule 23, in the end the central dispute the central issue is whether plaintiffs can prove that each of them were not paid actual cash value in a predominantly common way and with predominantly common evidence and they cannot do that. When we think about whether it's a common question driving the resolution and this may go to the predominance of individual issues as well, why don't we have that where actual cash value seems to be defined in the contract in the policy as looking at three factors, right? The market value, the age and the condition and where your client has injected another factor, the PSA, as something that is not referenced and that would not be understood by the other contracting party to be part of market value. Well your honor, what the contract says is that we're required to pay actual cash value and actual cash value is determined by looking at market value, condition and age. We don't think that specifies any type of methodology. There's nothing in the contract that speaks to whether we can, what elements we can use in determining what market value or actual cash value are and the Pennsylvania Department of Insurance has not issued any regulations that set forth a particular methodology. So we have a process that we use and we think that the Seventh Circuit in Cartman articulated the issue correctly. That is, if a policy holder is compensated for damage, that the insurer will have satisfied their contractual obligation regardless of the standard used to assess the damage. Here there isn't some specific methodology or specific exclusion. This isn't like the cases that we see from the Eighth Circuit, for example, where there's a particular methodological approach being used that's precluded by the contract or by regulation. Here the contract just speaks broadly about actual cash value and market value and lets Progressive determine whatever approach it wants to, to answer the question of what's market value. Now the plaintiffs may disagree that we've done that correctly and they're allowed to challenge whether we have accurately valued their vehicle and paid them actual cash value, but they need to prove that in the end and proving that for each and every single member of the class will be highly individualized. When your client has already committed itself to a particular methodology, that's what it's doing in practice. That's, Your Honor, it's true that we have... Let me finish the question. When your client's committed itself to a particular methodology, why aren't other contracting parties reasonably relying on the continuation of that and they should be held to it without adding in some new factor to that methodology? So we have not actually committed ourselves to any particular methodology. The contract actually says we can use whatever methodology we choose. We use in Pennsylvania the dual source approach as required by the state. The state specifies that there are 10 authorized methodologies we can use to value vehicles. We've selected two, actually, and both of those appear in the record, in the reports that the plaintiffs receive for the valuation of their vehicle. What the record shows is that actual cash value is not some precise to the penny number that everybody agrees on. It's a range. Even the plaintiff's experts agree that there's a variety of ways you can estimate actual cash value. That's what Pennsylvania is doing here by specifying there's 10 you can choose from. We've picked two, the NADA guide and the Mitchell valuation approach. The plaintiffs are challenging this intermediate step used in the Mitchell valuation approach. And all we're saying is they get to prove, if they want to, that we haven't paid actual cash value. And we get to respond that we have. And a jury has to decide, in the end, what was someone's car worth after it was totaled and it's the amount we paid in excess or not of actual cash value. Take, for example, name plaintiff Driggins. And this is in the record, Appendix 158. The amended complaint. That's plaintiff Driggins' valuation report. It contains the NADA estimate of actual cash value and the Mitchell estimate of actual cash value that the plaintiffs challenged. And the Mitchell valuation that had the projected sold adjustment is higher than the NADA estimate. A jury could conclude from that evidence that when we made our payment, we paid actual cash value or in excess. And if that's true, we wouldn't have breached the contract. The point about, I mean, are you going to be using to the jury the Mitchell NADA dual source method you've already used on the first go around? Are you going to be using different methods here to show overvaluation? We are entitled, under the due process clause, to introduce evidence to the jury of the actual cash value of the plaintiff's vehicles. We will likely, in Pennsylvania, rely mostly on the NADA values because they're in the record. They're in the valuation reports. Just to go back to your question, Judge Krause, let me give you a hypothetical to kind of prove the point. If, let's say, Progressive adopted a new approach. The new approach was that for the Mitchell valuation, we're going to do everything we normally do, including apply a projected sold adjustment. And then whatever number that comes up with, we're going to multiply it by 10 and pay the plaintiffs that amount. So take a hypothetical. We value someone's vehicle. It's $5,000. We've applied a $1,000 PSA. And we pay that person $50,000 for their vehicle. We would say, there's no breach of contract. Their vehicle is worth $5,000. We paid them $50,000. The plaintiffs would say, but you had a PSA in there, so it's a breach of contract. We get to sue on behalf of a  We think that's absurd. We think that is contrary to Lewis. Lewis was a case where there was a downward adjustment. And this court said, we don't look at that in isolation. We look at what happened at the end, at the end of the process, what was paid. This case is very much just like Lewis. It's a challenge to valuation. Our obligation under the agreement is to pay actual cash value. And we're not saying the plaintiffs can't try to prove we didn't. But what we're saying is, you can't do that on a class-wide basis. Because just like this court held in Lewis, determining what actual cash value is is highly individualized. And the plaintiffs, their response to that is to say, well, we have a common method. Just take the PSA out and use your method. But that doesn't end the case. They don't get to cut off our due process right to put in evidence. They even said to this court, in trying to prevent us from coming here on appeal, they took the position in their petition that we could challenge, quote, progressive can contest plaintiff's evidence that Mitchell valuations, except for PSAs, constitute the proper ACV amount. That's in their petition response brief at page 18. We're going to do that. We think that this methodology of stripping the PSA out is faulty. We're also going to give the jury evidence from the NADA guide, for an example, which is in the record, that whatever you think about our methodology, whatever you think about the PSA, and we think it's appropriate, we have paid actual cash value for a significant number of the plaintiffs, including named plaintiff's driggins. We're going to have thousands of mini-trials to determine that. That is not appropriate for class certification. This is the kind of case, this valuation case, where class certification is highly inappropriate. Now that's a merits argument. You gesture towards standing. I don't see what the standing problem is. But, you know, we've got our case, Huber v. Simons Agency, where, you know, that was just about having a record here. We've got the record. You're arguing on the merits about why this would be individualized. But that's not a standing problem. That's just a, we think that the jury is going to have a mess about that. Isn't that the better way to analyze it? I don't think so, Your Honor. I think this is a standing issue as well, because as you held in Lewis, the plaintiffs have to show that there was an injury that they suffered. And here, by focusing solely on the PSA and not whether they were underpaid, they're failing to establish that they have suffered any injury at all. On the merits, they can ultimately show that. But there, there was no connection to, you know, a real-world financial consequence, because that process had a bunch of other adjustments that more than offset it. Here, it biases in a downward direction, and then a majority of the time, so that's an individualized question. But I think there was a record problem there. Here, you know, you really just seem to be saying, on the whole, you have to go through the whole process to figure out which ones were injured and how much. Our argument on standing is not that the named plaintiffs lack standing, but rather that to determine standing for the remaining class members, which has to be done at some point, would require individualized proof. So we're not taking the position that the named plaintiffs should get poured out of court on lack of standing. What we're saying is simply that you can't have a class certified here, because to determine the injury required for standing, as well as the injury required for liability and damages, the individual issues would predominate. Well, that's, again, you're going to merits of class certification. But for standing purposes, just for the court to get past what's been filed and look at the merits, we look at what's been plausibly alleged. And haven't they, on the face of, by alleging breach of contract, by putting forward a factor that they say causes this downward trending in all cases, haven't they plausibly alleged a financial injury? I see the light has me, Your Honor. But to answer your question quickly, I don't think that they have. I think what the lesson of Lewis is, is that we look to see whether there's a financial injury that's been pled, even where they're alleging, like they did in Lewis, that they were challenging a downward adjustment in the process. You have to look to the end of the process to determine if there's been a financial injury. Here, by solely focusing on the effects of the PSA and not trying to show that they, in fact, have been paid less than actual cash value, they're failing to show that they've suffered a financial injury. Take my hypothetical as an example of a case where there would be a PSA applied, but no actual financial injury. If I'll save the rest of my time for rebuttal, if that's all right, Your Honor. Okay. Thank you. We'll hear from you in rebuttal. May it please the Court. My name is Jacob Phillips, and I represent the plaintiffs and the certified classes in this action. This case is about one thing, which is the application of the projected sold adjustment as part of Progressive's chosen methodology for calculating the actual cash value of total vehicles. Progressive's obligation was to pay actual cash value as determined by the vehicle's market value, age, and condition. Mr. Phillips, you've made an argument based on methodology on appeal, but what's in the argument seems to be based on output, on whether or not you were paid actual cash value. Why shouldn't we be looking to that and set aside the multiple different methodologies that are permissible under state law? Are we left with anything that really is a common question if the issue is, were you paid actual cash value? Yes, Your Honor, because actual cash value is not a free-floating thing in their policy. They have to determine actual cash value based on market value, age, and condition. The Eighth Circuit in Smith pointed out that if what the plaintiffs had alleged in that case, which was that the projected sold adjustment was based on rigged data, a false market, an artificially low market, then that would set forth a breach of contract claim for failure to pay actual cash value as determined by market value. That's the exact claim that we're bringing here, and we brought common evidence to support that claim, common evidence that they were manufacturing data, common evidence that empirical data shows that vehicles sell for list price, expert testimony that the used auto market right now, vehicles are priced to market, and appraisal expert testimony that the projected sold adjustment has no place in a proper appraisal. If absent class members were to bring their own individual claim, they could use that exact same evidence to bring their claim to make a prima facie case, and in fact, three judges have denied progressive motion for summary judgment on that same evidence. So clearly, this is a legitimate claim that can get to trial. The only question is, can absent class members rely on that same evidence to make their claim? The other cases you're pointing to are distinguishable. When you look at cases like, you know, Stewart, the Eighth Circuit reaches different results based on whether you've got a state law or a contract that defines actual cash value as a method and not, you know, ultimately in terms of the result. And here, the contract, there's no state law that requires it being defined exclusively in terms of a method. The ultimate touchstone is the result. I would disagree with that, Your Honor. Let me say this first. There are three appellate courts that I think you're referring to which are distinguishable in their facts, right? There are also 10 district courts facing this exact same fact that agreed with Judge Smith, and the Ninth Circuit in JAMA was also facing a negotiation adjustment similar to the one here. Now, as for Stewart, Hicks, and Mitchell, which I think you're referring to, and those policies, ACV, either by the policy or by state common law, had to be, the standard in that case was replacement cost less depreciation. Here, it's market value, age, and condition. But just because it's replacement cost less depreciation, you still have to go get a vendor. In that case, State Farm used a company called Zactimate. They still have to calculate what that replacement cost less depreciation is. That's the standard. And so, yes, it's distinguishable in that sense. It was a different standard. But it's no different. It's not as if replacement cost less depreciation is self-executing, and we know exactly what it is, and we don't have to hire a company to come figure out what that amount is. And here, when the question is market value, we have a state law that prescribes three different methodologies and 10 different grounds that can be considered as part of those methodologies. So, why should we think about this as a state law that specifies what the methodology is when they could use any number of them, all of them ultimately producing what the state is willing to recognize as actual cash value? So, two things. We are not bringing a claim based on a regulatory violation. And in the same way that an insurance company can violate a regulation without breaching a contract, they can also breach a contract without violating a regulation. You say they violated Pennsylvania law. So, are you retracting that? No, they breached their contract by not paying ACP as determined by market valuation condition. We never alleged that they violated the Pennsylvania regulation. And so, it's just whether they complied with the regulation or not is simply irrelevant to our claim. And I would also point out that that Pennsylvania regulation doesn't actually talk about actual cash value. It talks about what claims handling and it mentions, I think, replacement value and guidebook value. Progressive's policy explicitly said we're going to do actual cash value as determined by market value age and condition. They're bound by that problem. They can't seek refuge in the Pennsylvania regulation. They're bound by their contract. They have to give insureds the benefit of their bargain, which is to determine actual cash value as based on market value age and condition. And by manufacturing the data, by rigging the data and doing all of that, they breached their contract and they underpaid ACP. But what does it say in the contract that they're going to do Mitchell without taking any discount? We have no problem with them using Mitchell as a vendor. In fact, we have agreed with almost all of the methodology that Mitchell uses, which is to take comparable vehicles and make adjustments based on condition and equipment. So we have no problem with them using Mitchell. And I don't think that they promised to use Mitchell, but we have no problem doing that. In fact, we're holding them to that. That's the vendor that they chose. And all we're saying is 90% of it is great, but this projected sold adjustment, which is inconsistent with the market and based on manufacturer-rigged data that they tossed out all the data that they don't want, that's the element. That's the sole dispute in this case. Everything else about their methodology, great. This is the sole dispute, and it was built on rigged data, and it's a breach of the contract because it was not based on market value. That's the conclusion that courts across the country have come to. Okay, let's say we disagree with you. Let's say we think this is a result-based adjustment. A third of the time, people wound up, you know, being better off. Doesn't that mean that individual questions are going to predominate because this is just a step in the process rather than, you know, there's so much other work you have to do to figure out whether the result is right or not? I think you're referring to the fact that in 30% of the sample claims, the NADA value was higher than the Mitchell value. I'm sorry, the NADA value was lower than the Mitchell value. If that's what you're referring to, I would say that's also a common question. They're certainly free to go to the jury and say 30% of the class members, including one of the names' representatives, have a NADA value that was lower than the Mitchell value. We think that means we didn't breach our contract, and the jury can consider that question. But it's a common question. The Volino Court in the Southern District of New York faces that exact argument. Why is it that analysis would have to be made using every one of the different methodologies and different combinations of the factors that go into them? Well, it doesn't. So we're bringing our claim, right? We're going to present our evidence. Our evidence shows, if the jury were to credit it, that for every single class member, the PSA was a downward adjustment, which means that if they didn't pay ACV, they didn't determine it by market value, we're going to make our case. They can then present their evidence of alternative methodologies, if it's relevant and if it's admissible. Let's assume they can. They can put that in, and then the jury can weigh that and decide if plaintiff proved their case or if they didn't. But either way, it's a common question. To whether a given class member was paid actual cash value, and it's necessary to go through each one of the methodologies and different combinations of input to determine whether the actual cash value that was calculated using the PSA versus one of these other methods was lower, then how do we have a common question? How is there anything but individualized proof in that circumstance? The evidence in this case is not that there are other things Progressive could have done that would have complied with their contract. There is simply no evidence of that. They don't have an appraiser. No one pointed it to. So it's entirely speculative that maybe there's some other thing that they could have done, and maybe that thing would have been compliant with their contractual promise to pay actual cash value based on market value. There's nothing in the record of that, and it certainly wasn't an abuse of discretion for Judge Smith to decline to make a class certification decision based on speculation, and instead say what the record shows is that Progressive thinks actual cash value is this amount, and plaintiffs think it's this amount, and the difference between them is common. The difference between them is the projected sold adjustment. Well, to return to Judge Peebles' question, why isn't it enough to look at instances, even a handful, where another methodology actually results in a lower actual cash value determination? So we can, again, one answer would be that's a common question. Second answer would be Progressive didn't choose to do that methodology, and we're here about what they did choose to do and whether what they chose to do was a breach of contract. Now, I can get into the reason that guidebook values don't. So there is evidence that guidebook values, such as NANA and KBB, are not intended to and do not identify the actual cash value of the vehicle. What they do is give what's called guidebook values about a category of the vehicle. So they're not saying that this specific vehicle has an actual cash value of X. They're saying that the 2019 Ford F-150s in this 10-state region generally have the value of this. Progressive's contract does not say we will pay you the guidebook value of your vehicle. What it says is we will pay you the actual cash value of your vehicle as determined by market value, age, and condition. That wouldn't even be a legitimate defense even if they made it. And again, that's just one example. If they had had evidence that they brought an appraiser who said you could have used methodology X, Y, and Z, we could have addressed that, and Judge Smith could have considered that. But they didn't put that in the record. They didn't develop that evidence. There was nothing for him to evaluate. He just declined to speculate and instead granted class certification on the record before him, which was consistent with 10 other courts who have come to the exact same conclusion. And under the abusive discretion standard, the question is, is the conclusion one with which no other reasonable jurist could agree? We have 10 courts across the country agreeing. We don't review standing on abusive discretion. So why is there standing? What are the allegations in your complaint that are enough for standing? A financial harm, a monetary harm is a quintessential injury. If plaintiffs are correct, they were underpaid the actual cash value of your vehicle, that's a financial injury. If plaintiffs are correct, that doesn't mean every last one was underpaid the actual cash value. You admit that there are going to be some issues about individual people who maybe weren't paid, got more than the actual cash value. There's no evidence of that, hypothetically, theoretically. Your allegations leave that possibility open, that some of them were paid more. I don't think that they do. Under the evidence that we've presented, every single class member was financially underpaid. The evidence you've presented. Let's talk about the allegations. In our allegations, we say that plaintiffs are representative of the proposed class in paragraph 32 or whatever it was. And in representing those class members, plaintiffs allege that the projected sold adjustment was applied to every single class member, which it was. We've identified every class member. We've identified every single one, but let's say we disagree with you that this is a method case, and we're focused on the bottom line outcome. If the adjustment was applied and the adjustment biased valuations downward, but we believe that it's still open to them to argue, no, this plaintiff got paid more than the cash value or whatever. If there are class members who are unable to prove that they were damaged, then they lose their case on the merits. Damages are an element of the claim. Failure to prove that you were damaged does not mean that you lack standing in the first instance to attempt to prove that you were damaged. So it's not an Article III issue. The difference between this case and Lewis, which I'm sure Your Honor is familiar with, is that in Lewis, prior to ever filing suit, the condition adjustment that he was complaining about had been reversed. And then he was given an extra $1,200 just because. And so even if he had proved, yeah, the condition adjustment was insufficiently disclosed in violation of New Jersey law. Okay, great. But so you proved your case, you still weren't injured. Here, if we're right, if we prove our case, all class members were injured. To your point, we may fail entirely or some class members may not be able to prove that. But that just means that they lose their claim on the merits. It doesn't mean that they lacked Article III standing from the beginning. So you'd have us put that analysis to commonality or predominance, not to Article III standing. Correct. It's just, yes, Article III standing, we would say is irrelevant. The question is, is were the elements of Rule 23 satisfied here? And in this case, Judge Smith's analysis is consistent with virtually every court that's looked at the same claims under the same record. This is not blazing a new trail. This court isn't working from a blank slate. We have courts throughout the country analyzing very similar claims and coming to a consensus that, yes, this claim, which challenges the sole adjustment of an insurance company's chosen methodologies, they chose to do this. We live in the world of where Progressive actually had conduct, not all of the things that they didn't do. What they did was uniform misconduct subject to a uniform remedy. If we're right, and the jury agrees with our evidence, then every class member will have proven their claim and will have proven damages because the only dispute between the parties based on the record, not based on briefing and hypothetical things about things that Progressive did not do, Progressive stands by the Mitchell, their 30B6 witness, stands by the Mitchell report in its entirety. So does the Mitchell 30B6 witness. They have no appraisal expert that said anything otherwise. So based on the record, there is one dispute between the parties and it's was the projected sole adjustment a consistent reflection of the market or was it a reflection of a truncated, artificially low market because Progressive took data, tossed most of it, everything that undermined its thesis, and instead, and they calculated the PSA only on what remains. That was a friendship contract. I'm curious about preservation because you've certainly raised on appeal this intriguing methodological challenge, but what we have in the complaint appears to be solely related to receipt of a higher payment. The output versus methodology problem and where in your complaint do you raise an issue as to methodology as opposed to looking just to the output to what was received and that it otherwise would have been higher under some other method? So what we allege in the complaint is that Progressive, for all the reasons that we get into in the complaint, Progressive did not pay the actual cash value of the vehicle. We allege that we were underpaid and our evidence shows is consistent with those allegations. So I'm not quite understanding the distinction between outcome and methodology. What we allege is they underpaid ACV and our evidence is that they underpaid ACV and the reason they underpaid ACV is because they were required to determine ACV based on the actual market and what they did instead was determine ACV through an artificial market, artificially low market because of the deletion of the data and all of that. So we didn't change our, we've always alleged we were underpaid ACV and that's what our evidence shows. The reason we were underpaid ACV- Do you agree that if a different methodology for a particular client would produce something lower than Mitchell with the discount and the averaging with NADA, that that individual wouldn't have a claim as to liability and wouldn't have damages? There is simply no evidence of that in the record. So that's the point I was making earlier about we can come up with hypotheticals and speculation or whatever, but Judge Smith was required to make his decision based on the evidence. And so there is no evidence of a other alternative methodology that would have, and this is important, both been lower and also complied with Progressive's contract. So it's speculation upon speculation. First, you have to speculate that there's this other source out there that has a lower amount. Then you have to speculate that whatever that speculative source is, it would have complied with Progressive's contract. We don't think it would because we still have our evidence and if it was, then they can present that to a jury and a jury can decide but it would still be lower than what our evidence shows the ACV is. The contract, it talks about actual cash value that's determined based on market value, age and condition of the vehicle. So again, I just want to make sure I have an answer to the question. I understand you're contesting the premise, but if it were the case that using a different methodology that the actual cash value calculation turned out to be lower than it is under Progressive's calculation, the way that they're currently doing it, do you agree that that individual couldn't prove liability and wouldn't have any damages? I don't want to reject the premise, so I'll say it this way. If there was another vendor or another source out there that calculated actual cash value as determined by the market value, age and condition of the vehicle and that somehow ended up being lower than Mitchell and a jury thought that it was better than our evidence, then yes, they would lose their claim on the merits. But that's still a jury question, and there's, again, there's simply no evidence of that anywhere on the record, so Judge Smith couldn't have used that as it was not an abusive discretion for Judge Smith to decide to resolve cross-certification based on the actual record rather than what may or may not exist out there. But again, to answer your question, yes, if that source is out there and they comply with Progressive's contract, then certainly Progressive could offer that in theory and let the jury decide if they think this way was better, this source was better, or plaintiff's evidence is better. That's still a jury question. But when those different methodologies are, if they're both permissible under state law, how does a jury's view of which one is better have any relevance? Any of them can be used to calculate actual cash value, right? Well, I mean, in fair cases throughout the country all the time where someone, in homeowner contacts and auto contacts everywhere, where the parties have a dispute between what the amount of the property loss was or the actual cash value was or whatever, and it's not necessarily a contract interpretation issue. It's just the plaintiff comes and what the actual cash value of the vehicle is, is a question of fact. I mean, that's Pennsylvania law. So you don't have to come with a contract interpretation dispute. You can come and say, I thought my house was worth $350,000 and the insurance company thought it was worth $310,000 and the jury decides which one is more persuasive. So in that sense, it's still a merits dispute. But again, I would just go back to the fact that this entire thing, we're outside the record here, Judge Smith was never offered any of this evidence. And again, it was not at his discretion for him to resolve this issue based on the Bradford and a decision that was consistent with the overwhelming authority throughout the country of judges looking at this exact same claim under this exact same record. I know I'm way over time. So let me just ask that the order be affirmed. Thank you very much. Thank you. Well, with due respect, I think counsel just proved our point. If you have to have individual trials to determine the market value or actual cash value, words that are indistinguishable in the sense there's a methodology there. If you have to have individual trials to let the jury decide what's the actual cash value, what's the market value of this vehicle, this case is going to devolve into individual, individual cases. Like the Fifth Circuit said in Sampson, an explosion of predominant individual issues. But you don't have to take my word for it, by the way, that the plaintiffs really focus on this case being about value. Here's the summary of the case plaintiffs submitted to this court last week. Whether the district court abused its discretion in granting class certification for plaintiff's breach of contract claim against Progressive for its failure to pay the actual cash value of insured total loss vehicles. Here's what they said in the court below, Your Honor, to your point. This can be found at docket 52, page 11 in plaintiff's motion for class certification in the section titled the breach of contract. Here's the first sentence. This overwhelming evidence supports plaintiff's allegation that Progressive is breaching its insurance contract by paying less than the cash market value of insured vehicles. That's what this case turns on. What's the value of the vehicles? And I must say, Your Honor, that this suggestion that there's nothing in the record about this is false. At appendix 158, as I mentioned earlier, you'll find plaintiff Driggin's valuation report. It comes from Progressive's opposition to the motion for class certification. There was also exhibit D to the amended complaint filed in this case. At the bottom of the page, it says lost vehicle dual source base value, and it lists the NADA value and the work center total loss value side by side. And that's going to be there for every class member. If you look at in the appendix at 170, which is the declaration of Mr. John Retton, who was a Progressive witness. This was also submitted in class certification. Paragraph 7 of his declaration says there was a sample of claims requested by the plaintiffs. So we used their sample. There were 144 claims in the sample. He reviewed all of those dual source reports, and 44 of them, the NADA retail value was lower than the WCTL base value. Now, something I couldn't really understand, plaintiff's counsel said, well, that would be a common question. You present that to the jury. It wouldn't be common. You'd have to do that for every single plaintiff. And that's the problem here. Professor, the resort to these other methodologies, it seems like a sort of moving target as a defense. Why isn't the question here as simple as you were doing it this particular way using Mitchell, what you and that Mitchell and the averaging is the way that it's expected to be done. Instead, your client added in this other factor that was not something that a reasonable insured would expect. And that's a common question, whether under a different methodology, you'd come out with something different being beside the point. If what we're looking at is what's the reasonable expectation or reasonable understanding of the parties, why isn't that a jury question? Because in this case,  what we're actually looking at is will we breach the contract? So you look at what the contract requires progressive to do, which is to pay actual cash value or market value. So the question for the breach is, did we pay actual cash value or market value? And so the jury has to estimate is, what's the market value of the lost vehicle? And whatever methodology progressive used, did it kick out a payment that complied with the contract? This is not like the methodology cases that the plaintiff's counsel is referring to. For example, in the Eighth Circuit case, the problem was that they were depreciating labor in the face of a statutory provision that said, you may not depreciate labor. We don't have that here. We don't have here a contractual provision or a regulatory provision that says, you may not make adjustments to the list price of comparable vehicles who take into account estimates of sale prices. We have a contract that says, you have to pay actual cash value. It says, that's the market value. The plaintiffs, in their own brief in this case, say that those concepts intertwine. The question for the jury is, do we pay market value or not? The question for the jury is not, pick a methodology and then determine if progressive complied with it. It's, did we pay actual cash value or not? If they want to attack our methodology, they can. They can try to then convince a jury we didn't pay actual cash value. But determining the market value or actual cash value of a particular insurance car is going to require individualized proof. We're going to be looking at NADA values or other values within that range of actual cash value and asking the question to the jury, what do you think the actual cash value or market value of that car was? And was the plaintiff paid that amount or not? Why isn't there a deviation from any of the methodologies? Again, if we're thinking about the perspective of a reasonable insured and state law provides for certain methodologies to be used, sure, you could have used a different one, but in none of those circumstances would one expect that there would be this across the board discount taken. Why didn't we view it that way so that regardless of which methodology, the problem is that you didn't use the methodology in a pure sense. Well, actually, Your Honor, we did. So we're using the methodology that the Department of Insurance approved. What the plaintiffs are proposing is that that methodology be changed to their liking, that the projected sold adjustment, which is part of the methodology that was approved, be stripped out. No, you tacked on a deduction and you didn't consider any of the cases in which it was sold at value. You assumed that was a no haggle dealership. That's not what the department told you to do. That's not correct, Your Honor. The methodology that was approved by the Department of Insurance is the methodology that Progressive is using. Where did the Department of Insurance tell you, don't count anything that's sold at list price? They didn't comment on that at all. What they did was they looked at the methodology. They didn't tell you to do that. They didn't tell us not to either. They looked at the methodology. The methodology, first of all, was submitted by our vendor, Mitchell International, to the Department of Insurance and they approved it. And they continue to approve it to this day. We also use, side by side, the NADA methodology. The NADA, and by the way, the record is clear, the NADA methodology also applies a similar type of adjustment. All right, but that's not challenging. The point is, if you have two methodologies, you're averaging them. Lowballing one of them is going to lowball the overall amount of money you pay. And we are prepared to take on that challenge and to convince a jury that the amount we have paid complies with our contractual obligation to pay market value. This is not a fraud case. This is a breach of contract case. And the question is, do we comply with our contractual obligation? And just like the Seventh Circuit explained in Cartman, the question is, and in the end, did we pay the amount for the damaged vehicle that we were required to under the contract? If they want to attack our methodology to try to prove we didn't, they may do so. And we have a due process right to respond to that attack and to put in our own evidence that in fact we did pay market value. And let the jury decide. Just like counsel said, it's a fact question. Let the jury decide that. But the jury will have to decide that thousands of times for every member of the class. Because there is no common way to answer that. What is the relevance of your submission to the Department of Insurance as compared to the methodologies that are approved in the abstract by the Department of Insurance? Well, I'm not sure I understand the question. We don't submit it. The vendors submit to the Department of Insurance. The Department of Insurance publishes a regulation annually that says insurance companies, these are the methods you can use to comply with your obligations if you use this approach. So we pick the Mitchell one we use and we use the NADA one. And where... Professor has no role in that. And where in picking the Mitchell one is it clear that to any insured that that would include the PSA? Well, for every insured we, and again, this is in the record. You can take a look at Mrs. Driggins. When we publish their market value report, the last page of the report contains a step-by-step description of the methodology. You're talking about the settlement? Yes, the evaluation report. This is before the claim has been settled. Once we come up with valuations that's given to every insured, the insureds can take a look at it. They can then negotiate. Part of the record in this case, and this is very much like in the Lewis case, is that sometimes insureds come to us and they say, Progressive, you've offered me X amount. We think, I think it's too low. I think there should be an upward adjustment because I think my condition is better. Sometimes those claims get settled by just a cash payment of an additional amount just because Progressive wants to close the file. Right, but you didn't argue waiver here, which seems to be where you're going with that. No, I'm not arguing waiver. What I'm arguing is that we did put in evidence in the court below that there are highly individualized explanations for why someone was paid the amount they were paid. So even somebody who has a PSA reduction, an intermediate step, may have had negotiation with Progressive and received $500 more to settle. That's after the fact. In terms of what would be understood by the parties to the contract, where is it broadcast to insureds that it's not just the methodology like Mitchell, but that the PSA is also a permissible consideration? No, no, the PSA is part of Mitchell's methodology. It's not something that Progressive adds on on its own. It's part of Mitchell's methodology. When Mitchell applies its methodology, part of it, the PSA is being used in the step of identifying the value of comparable vehicles. So when Mitchell is trying to identify the comparable vehicles that are used to create its base value estimate, if all it has for a comparable vehicle is a list price instead of a sales price, because it uses both, for the list prices, it makes an adjustment based on data it obtains from J.D. Power as to what the sales price would have been to estimate market value. That is all being done by Mitchell in part of its methodology. It gets kicked out to Progressive. That's the base value we use. Progressive is not adding on the PSA. That's part of Mitchell's methodology. None of this is spelled out in the contract because the contract doesn't specify any methodology. In fact, what the contract says is we can use any methodology we want to determine actual cash value. As long as we're doing it in reference to the market, the market value, which is not a methodology, it's just, you know, we're trying to find the market value. There's a dispute whether we've done that here or not. We're happy to take on that dispute. We're happy to defend the product and our output. But we can't be forced to do that in a class action where we're going to have thousands of trials that are going to predominate. Because for every individual plaintiff, the question's going to be, what's the market value of this car? How much was this person paid? And that negotiation I was talking about is no different than what happened to Lewis. Okay? The end process may result in a payment to an insured that includes a couple hundred dollars or a thousand dollars extra from negotiation. So even if they had the PSA applied as an intermediate step, the end result, the payment to the plaintiff, may have been higher because of negotiation. And there's examples in the record, once again, in Mr. Ritten's declaration. Your Honor, we respectfully request that the court reverse the certification of the class and remand this case for trial on the individual claims. Thank you. I thank both counsel for argument this morning and would ask the transcript be provided with cost split between the parties.